UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF | ) | |
| THE UNITED STATES FOR: | ) | |
| | ) | |
| FOR A WARRANT TO IDENTIFY THE LOCATION | ) | |
| OF A CELLULAR PHONE ASSIGNED CALL NUMBER | ) | |
| (781) 534-4170 (TARGET TELEPHONE #2) | ) | 15-mj-4339-DHH |
| AND TO OBTAIN IDENTIFIERS OF OTHER | ) | |
| CELLULAR DEVICES AT THE SAME LOCATION | ) | |
| AS TARGET TELEPHONE #2. | ) | **Under Seal** |

## AFFIDAVIT OF WILLIAM B. WARD

I, William B. Ward, a Task Force Officer with the U.S. Drug Enforcement Administration ("DEA") being duly sworn, depose and state:

1.  I am Quincy Massachusetts Detective assigned to the Division of Investigative Services, Narcotics Unit, and I have been assigned as a Task Force Officer ("TFO") with the DEA since October 15, 2011. I am currently assigned to the DEA Boston Tactical Diversion Squad located in Boston, Massachusetts. I am a graduate of the New York City Police Academy and certified as a police officer in Massachusetts since 1994.

2.  As a DEA TFO, I am an investigative or law enforcement officer of a State, within the meaning of 18 U.S.C. § 2510(7), who is empowered by law to conduct investigations for offenses enumerated in 18 U.S.C. § 2516, which include violations of federal narcotics laws in violation of Title 21 of the United States Code. In 1991, I graduated from the NYPD Academy. As a NYPD officer, I was initially assigned to patrol division and then to the Bronx Task Force. Upon leaving the NYPD, I worked in the towns of Grafton and Franklin in the State of Massachusetts. While working in the town of Grafton, I was promoted to the rank of sergeant. In 2001, I was hired by the Quincy Police Department in Massachusetts. I was initially assigned

to the patrol division. In 2003, I was assigned to the Special Operations Division where I was a motorcycle officer. In 2006, I became a detective and was assigned to the Narcotics and Organized Crime Unit. I have attended numerous narcotics investigation courses, including a one-week narcotics investigation training at John Jay College that was taught by the DEA, FBI, and NYPD, focusing on narcotics recognition, identification, and investigation.

      3.     My duties include, but are not limited to, the investigation of narcotics violations and offenses. In the course of performing these duties as a police officer, I have been involved in narcotics purchases as an undercover officer. I have participated in various aspects of narcotics investigations including controlled purchases, undercover purchases, and surveillance. I have been involved in over 1000 narcotics investigations leading to arrests which included heroin, cocaine, marijuana, oxycodone, and other controlled substances. Through my training and experience, I am familiar with appearance, packaging, texture, and smell of many controlled substances. I am familiar with the terminology used by both narcotics users and distributors of controlled substances and the manner in which they disguise the subject of their conversations and operations. I have participated in joint investigations with the DEA, Federal Bureau of Investigation ("FBI"), and numerous state and local agencies. On the basis of my training and experience, I am familiar with the vernacular of illegal narcotics abusers and distributors. I am acquainted with the methods by which such persons seek to disguise the subject of their conversations and operations. I am also familiar with the full range of methods, practices, and techniques by which members of organized conspiracies illicitly transport and distribute controlled substances.

4.      I have personally participated in the investigation discussed in this affidavit. This involvement has included, among other things, debriefing cooperating sources and conducting surveillance. I also am familiar with the facts and circumstances of this investigation from oral and written reports made by me, other agents of the DEA, and members of other federal, state and local law enforcement agencies who have assisted in this investigation.

5.      Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a search warrant, I have not included each and every fact known to me and other law enforcement officers involved in this investigation, but only such facts necessary to establish probable cause for the issuance of this search warrant. Facts not set forth herein are not relied on in reaching my conclusion that there is more than sufficient evidence to support the issuance of the requested order.

## PURPOSE OF AFFIDAVIT

6.      I submit this affidavit in support of applications to determine the location of a cellular telephone assigned call number (781) 534-4170, and used by an unknown male (hereinafter, "UM4170") (hereinafter, "Target Telephone #2"), and to obtain identifiers on other cellular devices in the same location as Target Telephone #2. As discussed further below, UM4170 resides in an apartment development at 12 Malden Quarry Lane, Malden, Massachusetts, located at the end of a road. Location information is sought to determine where within the complex UM4170 is located. In addition, UM4170 appears to be using multiple cellular devices. From subpoenaed information, he appears to be switching SIM cards between devices based on different IMEI's that subpoena returns associate with the same number. Moreover, sounds were heard during one intercepted call that were recognized by linguists as the ring tone for WhatsApp. In additional, a Blackberry PIN has been associated with (781)534-

4170. Thus, the purpose of this warrant is to collect specific location information on the location of Target Telephone #2, and to collect identifiers on other cellular devices in the same location as Target Telephone #2 being used by UM4170.

7. As discussed further below, probable cause exists to believe that the requested information regarding Target Telephone #2 and the telephones in the same location as Target Telephone #2 will constitute or lead to evidence regarding offenses involving the distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); the use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b); conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; and/or maintaining drug-involved premises in violation of Title 21, United States Code, Section 856 (collectively, the "Target Offenses"), as well as the identification of individuals who are engaged in the commission of the Target Offenses.

8. For the reasons set out in this Affidavit, I believe that UM4170 is committing one or more of the Target Offenses, and that obtaining information about the more specific information on the precise physical location of the Target Telephone #2 and identifiers on the cellular phones in the same location as Target Telephone #2 will help determine the location of UM4170 so that law enforcement agents can conduct physical surveillance of subjects of this investigation without compromising the covert nature of the investigation; will help investigators obtain additional warrants for devices that will help uncover the identification of UM4170's criminal associates, including suppliers, runners and customer/redistributors; and will lead to the identification of residences and stash locations.

**TARGET-SUBJECTS**

9. The Target-Subjects in this investigation pertinent to the current requested order and warrant are as follows:

    a. **Juan PENA**, a/k/a Johny, a/k/a Johnny, a/k/a Rocca, a/k/a Miguel, DOB 4/23/1985, is a Hispanic male whose last known address is 74 Fernandez Circle, Randolph, Massachusetts. PENA has been observed using the Target Vehicle. Based on information provided by a confidential source, PENA is distributing a kilogram of heroin every two weeks. PENA sold over 200 grams of heroin and over 300 oxycodone pills to an undercover officer in this investigation. PENA is believed to be a mid-level distributor for a drug trafficking organization in the Randolph, Quincy, Everett, and Boston areas. PENA has a prior criminal history that includes an open heroin distribution charge, operating under the influence of alcohol, larceny, and knowingly receiving stolen property.

    b. **UM4170**. Since going up on a phone used by Juan PENA on August 12, 2015 (Target Telephone #1), we have learned that UM4170 is using Target Telephone #2, and is a drug supplier to PENA, as will be discussed further below. So far, UM4170 has not been further identified.

**PROBABLE CAUSE TO BELIEVE UM4170 IS COMMITTING THE TARGET OFFENSES**

10. Beginning in the fall of 2014, other agents and I began investigating the drug trafficking activities of PENA and his associates. PENA and his associates are involved with the "Mozart Street Gang" in Boston, Massachusetts. The Mozart Street Gang operates out of

Jamaica Plain, Massachusetts, and is known to be involved in the sale of narcotics and firearms. There are dozens of Mozart Street Gang members (also referred to herein as "associates") of varying ages (from teenagers to middle-aged men). Many are of Dominican descent.

11. PENA is a drug trafficker distributing grams of heroin and bulk quantities of oxycodone pills in the Boston, Massachusetts area. Over the course of the past year, PENA sold over 200 grams of heroin and 300 oxycodone 30 mg pills in nine separate purchases to an undercover officer. In addition, on June 24, 2015, PENA sold 30 grams of heroin to a confidential source ("CS") in a controlled buy that was set up by investigators.

12. On August 11, 2015, the Honorable Richard J. Stearns entered an order authorizing the interception of wire communications on (781) 518-8430, a telephone used by PENA, known in this investigation as Target Telephone #1. 15-MC-91252-RJS (under seal). Interceptions began on August 12, 2015.

13. Based on the intercepted calls set forth below, I believe that PENA sought to obtain, and did obtain, drugs for distribution from UM4170. UM4170 used Target Telephone #2 to talk to PENA. Forty-three calls and three texts were exchanged between TT#1 and TT#2 between August 11 and August 28, 2015. The last call was on August 28, 2015, and the last text was on August 18, 2015. The conversations were in Spanish. The information set forth below is from draft translations and transcripts of those calls. In addition, some punctuation has been added to make the draft transcripts more readable. "U/I" means unintelligible.

    a. On August 12, 2015, PENA used TT-1 to call UM4170 on TT-2 (Session 10), regarding obtaining drugs to distribute. PENA said, in part, "get me at least 300 of…of what you are going to receive. . . .try for my profit to be the 50, so I can pay [U/I]…but I want the job to work at least with the two (2)…with the two and a half (2 ½)." Based on my training

and experience and knowledge of this investigation, I believe PENA was seeking to purchase at least 300 grams of a controlled substance. I believe "with the two" or "with the two and a half" means the amount of cut PENA wanted to be able to add to the product.

      b.      On August 14, 2015, PENA used TT-1 to call UM4170 on TT-2 (Session 121) regarding when drugs were expected to arrive. UM4170 said in part, "that friend of mine that I met in Mexico, he is in Mexico, but he travels to Guerrero…Guerrero is another state in Mexico, so he told the people from here to bring me that, but that people did not bring it to me." Based on my training and experience and knowledge of this investigation, on Friday, August 14, 2015, UM4170 did not have the controlled substances for PENA that PENA expected, and UM4170 explained to PENA the reasons for the delay. UM4170 then said, "when I come down to Boston, we will get together to sit down and have a good talk, so we do not talk about this through here, do you understand?" Based on my training and experience and knowledge of this investigation, UM4170 expressed concern about discussing drug business over the telephone when he said "so we do not talk about this through here."

      c.      On August 16, 2015, UM4170 used TT#2 to call PENA on TT#1 (Session 245) regarding the expected delivery of drugs and their quality. In part, UM4170 said, "he is coming down . . . my friends are coming on Saturday with the load." UM4170 also said, "It is original. . . .the thing is, that they charge me a little bit more, but it is original." In part, PENA said, "what we have to make sure is that we have control of it, and not ruin it by adding stuff to it." UM4170 said, "I am not going to give you bad stuff . . . he sent me work, and it has moved well every time. But let's wait until this one arrives, do you understand? So I can see it with my own eyes, and then I'll tell you, 'Look, it's deadly' because as soon as I see it, I'll know, do you understand me?" Based on my training and experience and knowledge of this investigation,

7

UM4170 explained to PENA that the controlled substances were now not expected to arrive until Saturday, August 22, 2015.  He told PENA that the product was "original," which I understand to mean that it was of high quality and had not been diluted with cut.   PENA expressed concern about obtaining good quality product, and UM4170 reassured him that UM4170 would personally examine the product and confirm the product was "deadly," which in the context of this investigation, means "very good."

       d.      On August 18, 2015, PENA used TT#1 to call UM4170 on TT#2 (Session 381) regarding the anticipated delivery of drugs.  In part, UM4170 said, "Damn man! They sent me sand, dude."  PENA said, "Damn!  I'm giving my word dude…there are people now who wants 150, dude."  After further conversation about the bad drugs, PENA said, "Look, if you could get me something, somewhere…if you could at least get me 300 or something dude."  UM4170 said, "That is what I am telling you…that for tomorrow I will go because I got together with the people and they gave me the picture and all of that….  The picture, I will bring it to one of my customers right now so he can check it."  Based upon my training and experience and knowledge of this investigation, I believe "sand" means "dirt," which is street language for "poor product."  PENA pressed UM4170 to find him 300 grams of heroin.  In the context of this conversation, I believe that "picture" means "sample," and that UM4170 intended to take to a customer a sample to test to see if the product was good.  Based on my training and experience, rather than using chemical tests for purity of controlled substances, drug dealers often use their customers or addicts to "test" the product to determine its quality.

       e.      On August 23, 2015, PENA used TT#1 to call UM4170 on TT#2 (Session 600).  In this call, UM4170 told PENA that "they are coming up; they are on their way," and that, "They will arrive "tomorrow night."  Further discussion ensued about when the drugs would

8

be available for PENA, and UM4170 said "day after tomorrow," [August 25, 2015], and PENA said, "Okay."

    f.  On August 26, 2015, (Session 722), UM4170 called PENA and said, "That's here, tell me." PENA said, "Head over here then." UM4170 said, "What should I bring you?" UM4170 said, "Listen to what we are going to do….I am going to add 50 to 200 alright? And I'm going to bring you that to see how it moves." PENA said, "But that 50 to 200…damn…that's not enough, bro…" After some further discussion about the ratio, PENA said, "But is has to be 250 to 50, so it comes out good, because I want that stuff to work." UM4170 said, "Alright then." Based on my training and experience and knowledge of this investigation, UM4170 and PENA were discussing the amount of cut to be added to the drugs that UM4170 was bringing PENA, and PENA was concerned that the ratio of cut to the original drugs be smaller to ensure the product was high quality and customers would like it.

  14.  On August 20, 2015, investigators obtained a warrant for precise location information for Target Telephone #2. 15-mj-2216-MBB (under seal). That warrant expired on September 19, 2015. An additional warrant for precise location information for Target Telephone #2 was obtained on September 18, 2015. 15-mj-4317-DHH (which T-Mobile has not yet activated). Investigators used the location information supplied from the first warrant to attempt to identify UM4170 and to conduct surveillance of the transaction involving drugs between PENA and UM4170 on August 26, 2015. However, because of the nature of the neighborhood in which UM4170 lives, and the difficulty in maintaining covert surveillance in the area, the surveillance was unsuccessful. Based on intercepted calls in which PENA discussed drugs with customers following the calls discussed above (e.g. Sessions 729, 755, 760), I believe that UM4170 distributed drugs to PENA, but the exchange was not observed.

15. On August 28, 2015, PENA travelled to the Dominican Republic for his grandfather's funeral. He returned on September 4, 2015. Since September 4, PENA has not reused TT-1. On September 11, 2015, investigators obtained a warrant to use an electronic technique to attempt to identify the new telephone being used by PENA instead of TT#1. 15-mj-4292-DHH (under seal). On September 14, 2015, investigators executed that warrant, and identified the new phone number, (857) 389-6431. Use of the electronic technique ceased once the new number was identified.

16. As TT#1 was no longer in use, we did not seek to extend interceptions over TT#1. However, on September 18, 2015, we obtained court authorization to intercept wire communications to and from Target Telephone #2 used by UM4170. 15-mC-91252-RGS. Intercepted calls on Target Telephone #2 began on September 23, 2015, and show that UM4170 continues to be engaged in the Target Offenses and also talks to PENA on the new number. Examples include:

    a. On September 23, 2015, UM4170 used TT#2 to call 646-829-6111 (UM6111) (Session 10). UM4170 said, "I am gathering as much as I can, so that when they come, have it here for them, so they can give me something good, so we can work worry free." UM6111 said, "So, as soon as I arrive in Boston, I will stop by and will give you something." Based on my training and experience and knowledge of the investigation UM4170 was collecting money to have available to buy additional drugs when the drugs arrived. UM6111 said, "I have a question for you dude. What the fuck was that curtain? What the fuck was it that you added to it, because those junkies are scratching themselves." UM4170 said, "That is a good curtain, sonny." Based on my training and experience and knowledge of the investigation, "curtain" refers to "cut," and UM6111 was concerned the cut was bad.

10

b. On September 23, 2015 UM4170 used TT#2 to call PENA on the new number, 857-389-6431 (Session 16). PENA said, "if you work want to work with him, then work with him. . . . But listen what he did to me. I went with him to pick up some pills supposedly from one of his friends . . . and they supposedly took from him my $13,000, you hear?" Later in the conversation, PENA said, "It was him that robbed me." Based on my training and experience and knowledge of this investigation, PENA was warning UM4170 that one of his possible re-distributors was not trustworthy. During this conversation, the WhatsApp ring tone was heard in the background during the discussion of the $13,000 stolen from PENA.

c. On September 25, 2015, UM6111 called UM4170 on TT#2 (Session 52). UM6111 said, "Tell me, nothing?" UM4170 said, "I already told you, a couple days, dude." UM6111 said, "Yeah." UM4170 said, "I will call you right away, forget about it…I am more in need that you are." Based on my training and experience and knowledge of this investigation, UM4170 was waiting on a shipment of drugs to arrive, and UM6111 hoped to obtain part of those drugs to sell.

d. On September 27, 2015, (617) 991-0163 (UM0163) called UM4170 on TT#2 (Session 136). UM0163 said, "When are we going to be active? This week?" UM4170 said, "Like around the weekend." UM0163 said, "Damn." UM4170 said, "Grab a lot, grab a lot when it gets here."

## CONCLUSIONS AND REQUEST

18. Based on the information set forth above, and my training and experience, I believe that UM4170 is currently using the Target Telephone #2 to commit the Target Offenses, and that there is probable cause to believe that the specific location information on Target Telephone #2 and identifiers about other cellular phones in the same location as Target

Telephone #2 will constitute or lead to evidence regarding the Target Offenses. Further, I believe that UM4170 is using the Target Telephone #2 and the phones in the same location as Target Telephone #2 in the District of Massachusetts. The requested information is necessary so that law enforcement agents can obtain additional warrants as needed, conduct surveillance of UM4170, all to further identify the leaders, associates, customers, and suppliers of the organization and discern their patterns of behavior, including how they buy and sell drugs and obtain and dispose of cash proceeds.

19.     WHEREFORE, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), as further described in Attachments A and B, to determine the location of Target Telephone #2 used by UM4170, and to collect identifiers on the cellular devices in the same location as Target Telephone #2.

20.     Once the precise location of Target Telephone #2 and identifiers on cellular devices located with Target Telephone #2 have been collected, the use of the techniques described in Attachments A and B will cease; information regarding telephones other than the Target Telephone #2 and the cellular devices in the same location as Target Telephone #2 will be deleted; information regarding any telephones identified as used by UM4170 will be preserved and sealed for production in discovery, if required.

## MANNER OF EXECUTION

21.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a

communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

22. To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by Target Telephone #2 or receiving signals from nearby cellular devices, including Target Telephone #2. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to Target Telephone #2 and cellular devices at the same location as Target Telephone #2 and thereby prompt them to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by Target Telephone #2 and use that information to determine Target Telephone #2's location, even if it is located inside a house, apartment, or other building.

23. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Telephone #2, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be Target Telephone #2 or cellular devices in the same location as Target Telephone #2, and law enforcement will limit collection of information from devices other than Target Telephone #2 or cellular devices in the same location as Target Telephone #2. To the extent that any information from a cellular device other than Target Telephone #2 or cellular devices in the same location as Target Telephone #2 are collected by the law enforcement device, law enforcement will delete

that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing Target Telephone #2 and cellular devices in the same location as Target Telephone #2 from all other cellular devices.

24. There is "reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result." 18 U.S.C. §3103a(b)(1). Providing prior notice to the subscribers or user of Target Telephone #2 or cellular devices in the same location as Target Telephone #2 would seriously jeopardize the ongoing investigation, as such a disclosure would give those persons an opportunity to destroy evidence, change patterns of behavior, notify confederates, flee, or continue flight from prosecution.

25. The execution of this warrant will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510). To the extent that the warrant authorizes the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

26. IT IS FURTHER REQUESTED that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate the Target Telephones outside of daytime hours.

27. IT IS FURTHER REQUESTED that the warrants, this Affirmation, the Application, the Order, and any and all related documents, as they reveal an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against flight, and better ensure the safety of agents and others, except that working copies may be served on the DEA and other investigative and law enforcement officers, federally deputized state and local law enforcement officers, and other government and

contract personnel acting under the supervision of such investigative or law enforcement officers, and T-Mobile as necessary to effectuate the Court's Order.

28. IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of thirty (30) days after the termination of the monitoring period authorized by the warrants or any extensions thereof.

_____
William B. Ward
Task Force Officer
U.S. Drug Enforcement Administration

Subscribed and sworn to before me,
this 28th day of September, 2015

_____
HONORABLE DAVID H. HENNESSY
United States Magistrate Judge
District of Massachusetts

15

## **ATTACHMENT A**

This warrant authorizes the use of the electronic investigative technique described in Attachment B to:

1. Identify the location of the cellular device assigned phone number (781) 534-4170 within 12 Quarry Lane, Malden, Massachusetts; and

2. To collect identfiers on cellular devices in the same location as (781) 534-4170 within 12 Quarry Lane, Malden, Massachusetts.

## ATTACHMENT B

The "Target Cellular Device" is the cellular device assigned call number (781) 534-4170 and cellular devices in the same location as (781) 534-4170. Pursuant to an investigation of UM4170 for a violation of offenses involving the distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); the use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b); conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; and/or maintaining drug-involved premises in violation of Title 21, United States Code, Section 856, this warrant authorizes the officers to whom it is directed to:

1.  Determine the location of the cellular device assigned call number (781) 534-4170 by collecting and examining (a) radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and (b) radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by the officers; and

2.  Collect unique identifiers on cellular devices in the same location as (781) 534-4170.

Absent further order of a court, law enforcement will make no affirmative investigative use of any identifiers collected from cellular devices other than the (781) 534-4170 and cellular devices in the same location as (781) 534-4170, except to distinguish them from other cellular devices. Once investigators ascertain the location of (781) 534-4170, and identify the cellular devices in the same location as (781) 534-4170, information collected concerning other cellular devices will be deleted.

   This warrant does not authorize the interception of any telephone calls, text messages, or other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).